Mr. Hayman by remote. Is that it? Can you hear us? Yes, your honors. Okay. And we have Mr. Starr. So I have to get this right. Sterl. So ski. Yes, your honor. Thank you in the courtroom. And we'll start off by hearing Mr. Hayman first and see how this works as a combination remote in court proceeding. Thank you, your honor. May it please the court. I'm William Hayman. I represent the appellant Mark Johnson in his appeal of the judgment in favor of the SEC issued by the United States District Court for the District of Maryland. A judgment imposed a disgorgement remedy against Mr. Johnson, as well as a civil penalty against him for violations of the Securities Act and the Exchange Act. The this case, given its facts, presents a great opportunity for this court to provide guidance to not only this court, but the courts around the country on an issue that was left open by the Supreme Court in its decision in lieu v SEC. That is when and under what circumstances, applying traditional equitable principles, as the court instructed in the lieu case, a defendant who violates the securities laws can be required to disgorge funds received by one of its affiliates. Given these authorities in the lieu opinion, which I will discuss, and as further discussed by the authorities in the amicus brief that was submitted in that case by the authors of the some authors of the restatement of restitution, which can be found on page 92 of the joint appendix, the district court committed an error of law that should be reviewed de novo, when it essentially reasoned that if a an entity is controlled by a control person, that control person must disgorge all profits received, not only that the control person received his ill gotten gains in his pocket, but also all profits, ill gotten gains received by the control entity. That's the core of our argument. If the court agrees with that position, then for reasons I will explain the penalty determination. Let me just let me just ask you for a little clarification, which focuses on my outlook on this disgorgement remedy. As I understand what the Supreme Court is making clear is that disgorgement is an equitable remedy, and that it is basically retrieving ill gotten gains. And to that extent, the effort of the court must be to focus on the money and and and the notion that there's joint and several liability in the abstract would deal gotten gains were gotten by both entities. And in this case, if the facts show that the money was really obtained by Mr. Johnson, and placed in these various entities, the disgorgement remedy would be basically tracing that money to the entities and to him and disgorging at all. It's not as if the entity independently received money for independent conduct. And Mr. Johnson has to disgorge that I think I think the Leo opinion seems to suggest we have to focus on the money. And you clearly can't have double payment. And you clearly can only disgorge from the person who received it. And it seems to me the argument that the SEC is making in this case, or the commission's making, is that the entity received the money through him. And it's all really part of the same stream of entity. And it's like a it's like an entrepreneur receiving money and giving it to his daughter to hold until he needs it. And then he argues, I don't have the money, my daughter has it, and therefore I can't disgorge it. I think that's the SEC's argument, I may be wrong. And, but I place that out to you just to modify a little your assumptions, because your assumptions seem to lead to your argument conclusion, inevitably. And so I think you have to go back and look at the whole notion of what disgorgement is all about. That's probably the effort we ought to be discussing. Yes, Your Honor. Thank you, Your Honor. This, this question and the factual question that you just raised is a good one. What happened with just a minute, could you hold on one second, the screen, Nick, Ricky, the screen has a white square in front of it's blocking. Is there a way we can get rid of that? You might want to stop the clock while you're. Yeah, we'll give him a little extra time. You see that square there? That's perfect. That's wonderful. Thank you. All right. We have not punished you with any loss of time on this. Thank you, Your Honor. I did reserve two minutes for rebuttal. Yes, sir. No, you keep going. You've got plenty of time still. Thank you, Your Honor. The question that you asked about the facts and what happens with the money is a question that was raised below. And I want to be clear about one point, which is we're not saying, although traditionally inequity a long time ago, tracing was required. In other words, there needed to be a tracing of the race in order to get at the time it was restitution. And you can look at the admiralty cases cited in lieu. And you can see in those cases that if someone did not have the asset, they did not have to discourage. That's no longer the law. And that's not what we're saying. What we are saying is that in this case, the put into a consent judgment with the pro se defendant. And in that judgment, the government said, this is what we're going to go after. And the consent judgment is in the record. The consent judgment has no reference to control person liability being a remedy. And in answer to the question with respect to historical principles of equity, the fact is that one looks to what the wrongdoer received. And that is what Judge learned him said, in the NGM, the Sheldon GM case. And what happened, what happens if as a factual matter, a salesperson speaks fraudulently to a customer and obtains money, and then directs that money to go in the bank account of one of his subsidiaries, he said, I want you to make the check payable, deposit it by or electronically into that bank. And then when it comes time for disgorgement, he says, I never got the money, the bank has it. Is that money subject to disgorgement under your understanding? My understanding, that money, in that case would be subject to disgorgement, the fact that the person no longer has the has the race no longer has the property would not prohibit the disgorgement. Although, when you look at it in the global context of what courts did, and I will come back to this. Again, if you look in the Sheldon, the MGM case, which is that 106 F second 45. In that case, the corporate defendants did funnel money to a partnership that they control. And what Judge hands that and this was affirmed by the Supreme Court was that there is no ability to disgorge that money that flowed out. But that's not the facts. In this case, I would point to docket 86. In this case, it did not cite the whole thing in the joint appendix. But in this case, it's extremely clear this is a page three of the Security and Exchange Commission's supplemental briefing on remedies at the bottom of page three, and also in the declarations that they submitted by their own CPA. There's no question, there's no ambiguity here as to what Mr. Johnson received. And that's why this case is different than the example that you just made your honor. If Mr. Johnson had been responsible for monies coming into investors into his own bank account, and then he used it for his own benefit, or he sent it to his wife or to his sister or to whomever, yes. What if he sent it to a subsidiary wholly owned subsidiary, he formed and controlled the money to go to the subsidiary, and he could pull that money out at will and move it to another subsidiary, or he could move it back to his own bank account later. Is that a different factual circumstance? It's a different factual circumstance than the ones of this case. Because in this case, what the SEC argued below, and what the facts show that they cannot controvert now, is that they initially requested $2.2 million in disgorgement from all the defendants. And then they said, after the Lou decision was decided, where they rebriefed the issue of remedies, and they said, this is the expenses, and that has to be discouraged from the company. And there are three categories, advertising and promotion expenses, event and trade show fees, and airfare. That's what they submitted in evidence. So there's $524,000 and some change. Okay. Actually, it's down to the exact dollar $524,591 that the SEC has said was not used for legitimate reasons. But none of that money went to Mr. Johnson. Mr. Heyman, I'm sorry. So early on in response to Judge Niemeyer's questions, you indicated that you weren't suggesting that the SEC would necessarily be limited to tracing and deciding whether or not disgorgement is appropriate. But isn't that essentially the argument you're  merely traced and admitted to a specified amount with respect to your client, that that's the end of the story. But the problem here is that the evidence of record also shows that he was the control person for this corporate entity. And so it would be logical to assume that in addition to the amounts that the SEC has specifically linked to your client, that there were also additional amounts that were funneled through that corporate entity writ large, that he too should be responsible for as a matter of disgorgement. So why isn't I mean, what's wrong with that? I think respectfully, there's a logical fallacy there, to say that logically, he received the money that went to the corporate defendant, when the facts show otherwise. Now, the fact that someone is a control person, and we brief this does not mean and the fact that someone controls can control the accounts and move money does not mean that he's the alter ego does not mean that there should be a piercing of the corporate bail or anything of that sort. And the fact is, what Lou says is that a defendant should not be required to disgorge more than his ill gotten gains. And in this case, I understand your honors point, but we know, we don't have to guess. We know what he got. Out of the money that came in, the government has said, this is all that he received 156 963, he didn't receive any benefit on that. So in the Supreme Court's decision in the Kokesh case, the court made clear that disgorgement is a penalty. In this case, is there any evidence that he moved funds from Owings to Owings subsidiaries? There is evidence that funds were moved between the different Owings group subsidiaries and the relief defendants in the initial busy declaration. However, the government took all of that into account when it did its analysis. So I would respect my follow up question on that is when the funds were moved, was that under his decision making and power? In other words, he had the authority to move among the corporation's assets, including using corporate assets for his personal expenses as needed, didn't he? That's in this case I'm now asking about. Well, he did have that authority. There's no question about it. But there's no allegation in the case, particularly at the motion for judgment stage, that he exercised that authority improperly, other than with respect to the $524,000 in expenses that SEC has said the rest of it was legitimate. And in fact, I do want to make sure I have time to speak about an old case. But it is important in this history, which the district court did not want to hear. Respectfully, Judge Bennett was pretty clear on that. He believed and he cited to a case from the 1990s from Judge Blake, SECB Resnick. He believed, as happens in many of these cases, that a control person, because they can control the account, they've got to discharge whatever the company got, even if... Well, let me ask you this, Mr. Haven. Didn't Lew hold that courts may impose joint and several liability for, quote, concerted wrongdoing? And wasn't that found in this case? Honor, concerted wrongdoing was not found in this case. What was found was that Mr. Johnson was a control person, and he controlled the entity. But I would point this court to its decision... Oh, the entity can only act through its agents, right? I mean, a corporate entity is an abstract notion that carries out its conduct through its agents. And in this case, his agent happened to be Johnson, wasn't it? It's correct. However, however, the monies that went to the Owens Group, according to the government's own case below, were used for legitimate business expenses, except for $524,000. So if we did not know... But that wouldn't make them not ill-gotten gains. The fact that you spend it on legitimate, as opposed to illegitimate. In other words, the question is whether the gains were ill-gotten, and whether they should be disgorged as assets controllable by Mr. Johnson, if the entity that had the assets was somehow part of the wrongdoer, as the Supreme Court observed in Lew. Well, they are ill-gotten gains. However, the Supreme Court in Lew has made clear that if the gains are used for legitimate business expenses, then they do not get disgorged. So if the court would... Even the district court below recognized that, and that's why it held that Mr. Johnson was up $524,000 plus the money that he received. I see I have one minute left, but the court said I could have a little more time. So I do want to make sure the court is aware, just historically, of two things. One is Nelson Slaibus v. F3rd 505. That's the one case that we located from this court that discusses the practical partners concept, and that case was a copyright case. Your Honor, may I go over? I just want to be respectful of my time. Yeah, we'll give you an extra minute. You also have rebuttal too, so why don't we give you an extra minute on direct, and we didn't use up much time. We stopped the clock when we did this. So there are two points. One, Nelson Slaibus, in that case, the court, similar to this case, there was an owner of a company that breached a copyright or violated copyright laws by taking architectural plans, and the owner controlled the company. His name was Turner, and the court vacated the decision of the district court because there were no facts in the decision that went to show that there were practical partners. It's not addressed, and if the court looks at the district court's opinion, the court will see that there is a statement about what the law is and concerted partners, but there's no discussion about whether Mr. Johnson is a practical partner, and that was error. In addition, I do want to make sure that the court is aware of the famous Elizabeth V. Pavement case, because in that case, there was an agent, and if one looks at the Supreme Court decision, it looks like, oh, the agent just got a salary, so therefore what the court said was the agent does not have to disgorge that salary, but I would respectfully ask the court to look at the district court opinion, which preceded that case, which is American Nicholson Pavement Company v. Elizabeth. It's at 15 F CAS 691. In that case, it is important to see the wrongdoer, this agent who was referenced in the Supreme Court opinion, the agent was actually a controlled person. They didn't use that term at that time, but he was controlling the patent violator, and he owned the patent violator, and the court still said he did not have to disgorge. That's traditional equity, and respectfully, if one looks at Lew, there are such limits. Well, I think Lew intended to preserve traditional equity notions, and I think the idea was that we really do have to focus on the assets received by the defendant, ill-gotten gains by the defendant, and I think the question here is whether assets in some entity controls is part of that, but I think the idea is still to preserve the equitable principles. Well, let's move on to Mr. Gaylord, and we'll get back to not Mr. Gaylord, excuse me, Mr. Staroselski, I'm going to try to get that right. We'll move on to him and come back to you on rebuttal. All right, Mr. Staroselski, you can give me a better pronunciation, I'm sure. I apologize. No, that works great, Your Honor. Thank you so much. Just want to make two points at the outset, first about the test and second about the fact. So the test, Judge Floyd, you're exactly right, the court said that there could be collective liability imposed when there's concerted wrongdoing, and kind of on the flip side of that, what the Supreme Court was concerned about was a situation like in Belknap where a defendant does not participate in the profits obtained from the violation, and the court talked also about the Contarinas case where the Contarinas didn't control the profits, he didn't control the disbursement of the profits, the profits accrued to another entity. But turning to the second point, that's nowhere near the facts of this case. What do you understand to be the meaning of concerted wrongdoing? How would you describe that in other words? I think the idea, and I think there's a distinction drawn in some of this court's case law as well, the distinction between concerted wrongdoing when they really act together to produce the violation, and as a result of their joint action, you sort of can't figure out when the money comes in, who got what, so the equitable justification for apportionment there breaks down. How does that play out with a corporation? In other words, a corporation is a small, a closely held corporation, has Mr. Johnson as the principal control person, and the corporation is a separate entity. What's concerted action mean in that context? I mean, the corporation is really only acting through him, isn't it? Yeah, and I think, Your Honor, that's actually what makes this a straightforward case that makes this case in the heartland. Well, then that would make every corporation subject to disgorgement, regardless of the notion of concerted wrongdoing. No, no, Your Honor. Well, there has to be a concerted wrongdoing between two violators, so here he's in, what we have here, it's almost a species of this concerted wrongdoing. It's kind of like the narrowest possible instance of that because he's conspiring with himself, and just to go back to the facts briefly, you know, he, the idea that Mr. Johnson didn't benefit from these funds that went to Owings is completely counterfactual and contradicts his consent. He agrees in the consent that he controlled Owings and the bank accounts, and I think this is crucial. The reason that the money goes to Owings in the first place is because Mr. Johnson wanted to conceal from investors that he's the one pulling the strings, and the reason that he sets this up this way is he'd recently been convicted of securities fraud in another scheme, and so he wants to obscure from investors that he's in charge here. That's why the money comes in. In terms of what happens with the money, Mr. Johnson argued in his opening brief that there wasn't commingling, and we demonstrated our response that that's just not the case. He commingles money going in and going out, so when the money comes in, it's all pooled in Owings' bank accounts, and then when the money comes out, my sent it. He commingled the money among the various entities. He also sent money to MJSC, which is Mark Johnson Shell Corporation. He sends hundreds of thousands of dollars there and then sends some of that money back. Now, it's true that in the revised declaration of Ms. Vizzi, we took a very, very conservative tack, and we really tried to separate the legitimate expenses from the illegitimate expenses, and we landed at a conservative number, but Ms. Vizzi is not making a legal judgment about who should be deemed to have received that money. She's just separating profits from legitimate expenses. What are legitimate from non-legitimate? How about if he doubles his salary? Is that legitimate? So, that's an example from the Liu case that an exorbitant salary is an example of an illegitimate expense because it's just a gain under another name. The test from Liu is you have to, for determining what's a legitimate expense, is you look to, is it a gain by another name? And that's exactly what we have here. My friend has conceded. What if the corporation buys a yacht for itself to entertain customers? I mean, I think it could be a fact-based judgment. Here, you don't need to reach any of that because he's conceded that it's not a legitimate expense. And the reason he concedes that is because the expenses that we're talking about, they weren't permitted by the offering document. So, I think, you know, I suppose you could imagine a yacht is what investors contemplated their money would be spent on. That's not the case here. And there's no dispute about the amount of the net profit that we're trying to disgorge. There's, my friend just conceded again in his presentation that tracing isn't required. And I think that essentially decides this case. Is it problematic that the district court failed to explicitly consider Johnson's financial condition, but clearly did so for the other defendants? So, I think that gets at the civil penalty determination, Your Honor. I mean, I do think the court did consider his financial condition. And if you look at the hearing, the court pressed our counsel very strongly on that. The court wanted the civil penalty to be proportional. The court recognized that it could have imposed a much higher penalty than it did, but it didn't want to be overly punitive. And so we think the court properly exercised its discretion in that regard. When he got to analyzing the factors, he didn't even mention Mr. Johnson in the financial condition, but he did explicitly say about the other two defendants because he didn't impose a penalty on them. Your Honor, I read that discussion to include Mr. Johnson as well. Now, the judge focused on the other defendants because he wound up there. They had much lower degree of scienter. And so the court, for that reason, as Your Honor said, didn't impose any penalty on them. But the court, we think, did take Johnson's financial condition to account. That's why he received a much lower penalty than what he could have been ordered to pay. So Mr. Hammond's first argument is that being a control person standing alone is not sufficient to warrant discouragement in a typical case. Do you agree with that principle that that by itself isn't? I mean, you're arguing that there's more here, I know, but is it the government's position that that moniker by itself is enough? We're not asking the court to go that far, Your Honor. And as we put forth in our brief, there are two paths that the court could take here to affirming the judgment. One is under the control person liability provision in Section 20A. Even there, the control person's entitled to a good faith defense. And if the courts are quite clear that 20A isn't insurer's liability. Well, I mean, with respect to that, there's an argument that the government waived that analysis. Sure, Your Honor. I mean, I want to be clear. We think it's available to the court. But if the court has any question about that, we're completely fine with the court analyzing this case under lieu as well. Under the statute, is that all that's required if we were to take that view? Just control liability standing alone? Well, the statute says that the control person shall be held jointly and severally liable, shall be liable jointly and severally with and to the same extent as such control person, unless the controlled person makes out a good faith defense. I think there could be, we cited case law that even when you have Congress channeling a court's exercise of its discretion, there's still a reservoir of discretion for the court to impose a remedy that, so long as it's not inconsistent with the purposes of the act. So I think, you know, maybe there are some cases out there where you do have a controlled person, but just looking at the purposes of the act, joint and several liability might not be appropriate. And I think, you know, the key animating purpose of the act was to prevent evasion. Is it a problem that section 20A was not mentioned in the Johnson consent judgment? Your Honor, I don't think that's a fair reading of the consent judgment. The consent says that solely for the purposes of the motion, the allegations of the complaint shall be accepted as and deemed true by the court. That's that paragraph three of the consent. And part of the allegations of the complaint are the controlled person allegations. I mean, that's what this whole case is about, is the consequence of Mr. Johnson's status as a control person. So I don't think that he can, you know, escape liability on that ground. So I wanted to follow up on Judge Floyd's question regarding the civil penalty, because there's two issues there, right? There's the issue of whether or not the district court actually considered Mr. Johnson's financial condition. And I have to say, like Judge Floyd, I'm a little bit flummoxed by the fact that the district court spent so much time talking about that in the context of these other two defendants and said zero about it with respect to Mr. Johnson. So that seems to me to be problematic. But then there's a separate issue of the fact that the penalty in this case mirrors the exact amount that was imposed as a matter of joint and several liability. And you've got these cases that suggest that that's just not appropriate. So can you address that? Certainly, Your Honor. So on the first point, again, I do think, and I think the district court held a two-hour hearing on this because it said it wanted to suss out these issues. I think the court deserves the benefit of the doubt. And if you look at the opinion, what it says, all of the defendants made an argument about their financial condition. And then the court says, in light of these considerations, here's what I'm going to do. Yes, the court focuses on the other defendants because they're less culpable and for other reasons. But I think, you know, giving the district court the benefit of the doubt here, I think the court did take his financial condition into account, which is why we're at a lower penalty award than we requested, dramatically lower. In terms of the second point Your Honor made about the amount reflecting the total sum received, I mean, a couple of responses. First, the statute says that you can calculate a penalty based on the gain to such defendant. And for all of the reasons that I was saying earlier, that's exactly what's happening here. The gains come in to Owings, but they're properly considered the gain to Mr. Johnson. And even if you want to think about them being technically discreet, we've cited case law as well that courts recognize that multiple defendants can benefit from the same amount of gain. Beyond that, I think, and I think this is where we're back at 20A, the general case law says such defendant precludes joint and several liability. But the terms of 20A are expressed, and they govern here. Well, as a follow up, just as a question, what about the mirroring? I mean, they're identical amounts. Yes, Your Honor. So the court, what the court was doing is it recognized at the hearing, and I believe in the opinion as well, that it had discretion to determine the proper amount. And it doesn't want to just pick a number out of the blue. It wants to pick a number that is meaningful, that instantiates Congress's purpose in having civil penalties. And the purpose is, it's a well-recognized framework in commission cases. First, you take away the defendant's ill-gotten gain. That's what disgorgement does. And then the civil penalty is a financial disincentive on top of that. And the court looked at the number of Johnson's disgorgement liability as a guide. But that was perfectly permissible for the court to do. That's a very reasonable approach. It could have looked at the number of violations and just done a statutory penalty. We would have been over, you know, there's 50 investors, the statutory penalty is in the neighborhood of $150,000. We would have been over $7 million in that circumstance. Under the terms of the statute, under 20A, it could have held them jointly and severally liable, not just with the entity, but with other individuals. But that's not what it did here. It took a conservative approach, and we think that was perfectly reasonable. Anything else? No, Your Honor. We ask the court to affirm the judgment. Thank you. All right. Mr. Heyman, we'll hear some more from you. Thank you, Your Honor. The first point is that counsel referenced the ill-gotten gains. I, again, would ask the court to look at warning about transforming any equitable profits-focused remedy into a penalty. The only gains that Mr. Johnson received are $156,000. The fact that he is the manager, managing member of an entity, and like other owners of companies, can move money between affiliates does not mean that a corporate vow should be pierced or that money that goes to the companies goes to him. It would be commingling if investors' monies went directly to his bank account or if he was using the company's monies to pay for his house or his boat, but that's not what the evidence is in this case. Respectfully, I would ask the court to look at what Ms. Vizzi said and what the government said. With respect to Section 20A, of course it's a waiver. You cannot not argue something below and then come in on appeal after a privacy defendant agrees to a judgment in which that does not appear in the judgment and say, well, this is a basis for an award. I would also point out that with respect to Section 20A, the statute also limits the remedy that can be given to what's in equity. That was prior to the National Defense Authorization Act amendment of the statute, and that is the current law under the new statute. So in equity, again, what will be happening if the court affirms Judge Bennett's decision will be to impose a penalty because Mr. Johnson will have to pay out four times more than what the government's evidence shows that he received? That is the point that I feel from the questions may be being missed. Just because money goes into a company does not mean that the control person receives that money. And the last point I would like to make, Your Honor, is in a case cited by both parties, SEC v. First Jersey Securities, and this is a point that was made by the Second Circuit. In that case, the question was, in that prelude case, whether a control person could be required to disgorge just the amounts he withdrew from the firm that he controlled that was involved in a securities fraud, or whether he would have to disgorge everything that the company got. But the court held that he would have to disgorge everything that the company got. But there's an important point that it made at page star 74 of the Lexus opinion. It said, the contention that this control person should be required to disgorge only amounts that he withdrew from the firm might be more persuasive if he had owned less than all of First Jersey's stock. Mr. Heyman, let me ask you this. In that consent judgment, didn't you concede to all the allegations in the complaint? Yes, Your Honor. He conceded to the allegations in the complaint. The consent judgment, however, has a description of what the relief should be. So, in other words, he conceded that he was a person. And then the court sent it, he agreed, and if the court would bear with me, this is at page 63 of the joint appendix. The court shall determine whether it's appropriate to order disgorgement of ill-gotten gains and or a civil penalty pursuant to section 20D of the Securities Act. They didn't cite to section 20A. And the government drafted that judgment. And I'm not trying to say this is a game of, it's not a game of gotcha, but it's not fair to take any defendant and to say, this is how you're going to be judged to determine what you have to pay back. You go argue for two hours before the district court and you don't raise this issue and then come in on point out we've argued this in our brief. There's a real tension there. If someone is a control person, does that mean that if that person made no money from the scheme, but the company made a billion, that he has to disgorge a billion? That is the logical conclusion of what they were saying. Returning finally to First Jersey, and I appreciate the court's time. In that case, the court said, if Mr. Johnson, excuse me, if Mr. Brennan was not the sole owner, then we wouldn't necessarily have a disgorgement remedy with respect to the corporation's profits. In this case, the district court did not address the fact that as a matter of fact, Mr. Johnson was one of three owners of the owners group. Does the record show what his percentage was? It does not. Unfortunately, we're stuck with the facts that are in the complaint that the SEC drafted, and I think they should be binding on the SEC. The complaint talks about controlling, so I would assume that he has the ability to carry the majority at least. The majority, but he did not. Again, I'm stuck with the record as it is, but the fact is, and again, I would say if the court looks to Judge Learned Hand's opinion with respect to what he did in the MGM case, there is an argument that if someone is a partner, and I appreciate the court's time. This is so interesting, so I appreciate the court's time. Thank you. If there is an argument, someone is a partner, of course, money that goes to partnership is attributed to that partner. That's what Justice Thomas was talking about in his dissent in lieu. In this case, however, what the government is saying is, because he's an owner, without respect to how much he owns, he has to disgorge everything that the government has went to the corporation. Finally, I would like to close- Finally, three times, so this is your final. I just want to close again with the amicus brief. The authors of that brief, particularly Haycock from the University of Virginia, they're the real experts on restitution, and what he said, this is on page 128, is it is settled that in the great run of cases, each defendant is liable only for his own profits. The court should not recognize an exception for practical partners who are not legally partners. Belford, which is a case discussed in our brief, should be disapproved to that extent. Apart from that, Belford is one more example of a wrongdoer's liability for profits pursuant to a general grant of equitable jurisdiction. Respectfully, that's all we're asking the court to do, is require Mr. Johnson to disgorge his ill-gotten gains, $156,693, respectfully. Thank you, Your Honor. Well, thank you, Mr. Heyman. We appreciate your willingness to proceed on remote. I know the circumstances required it, and thank you, Mr. Staroselski, for your arguments here. We normally come down and shake hands, and we are unable to do so under our current protocols, but we'll return to it. We invite you back on this case or other cases, and we will shake your hands. Thank you for your argument. We'll take a brief recess.
judges: Paul V. Niemeyer, Albert Diaz, Henry F. Floyd